IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| R.F., through his parents R.F. and E.F., of Coopersburg, PA, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. 18-1756 |
| | : | |
| v. | : | |
| | : | |
| SOUTHERN LEHIGH SCHOOL DISTRICT, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## **MEMORANDUM OPINION**

Smith, J.                                                                                      August 7, 2019

This case arises under the Individuals with Disabilities Education Act ("IDEA") and represents years of back and forth between the minor plaintiff's parents and the school district. The plaintiffs argue the school district violated the IDEA by failing to provide the minor plaintiff with a free and appropriate public education during his third, fourth, and fifth grade school years. The plaintiffs presented their case to a due process hearing officer who upheld the school-prepared individual education plans.

The plaintiffs now move for judgment on the administrative record and argue that, if the hearing officer applied the correct legal standard and properly understood their expert's testimony, then they would have prevailed below. The school district disagrees and contends that the court should deny the plaintiffs' motion because it fully complied with its obligations under the IDEA. Ultimately, the court agrees with the hearing officer because the record reveals that the school district provided the minor plaintiff with a free and appropriate public education during his years of enrollment. As such, the court denies the motion for judgment on the administrative record, including the request for reimbursement for an independent educational evaluation and

compensatory education, because the hearing officer did not err in either his legal or factual analysis.

# I. PROCEDURAL HISTORY[1]

In the summer of 2017, the minor plaintiff's parents initiated the underlying administrative action by requesting a due process hearing from the Pennsylvania Office of Dispute Resolution. Admin. R., Ex. 11.[2] The case proceeded to a three-day hearing before Charles Jelley, Esq. ("Hearing Officer") in late 2017. Decision at 1. The parents argued that Southern Lehigh School District ("District") denied R.F.[3] a Free and Appropriate Public Education ("FAPE") and violated the Americans with Disabilities Act ("ADA") and section 504 of the Rehabilitation Act during the 2014-2015 (third grade), 2015-2016 (fourth grade), 2016-2017 (fifth grade), and 2017-2018 (sixth grade) school years. Decision at 2. After making extensive findings of fact, the Hearing Officer found the District provided R.F. with a FAPE as to each challenged individualized education program ("IEP") and accordingly denied the parents' requested relief, namely reimbursement for an independent educational evaluation ("IEE") and compensatory education. *See generally* Decision at 20–26. After receiving the Hearing Officer's order, R.F., through his parents, filed the instant action on April 26, 2018, asserting causes of action under the IDEA, the Rehabilitation Act, the ADA (collectively, the "Acts") and the Acts' respective state analogues. Compl. at 1.

---

[1] The court agrees with the Hearing Officer's categorization of the parties in this case, namely that R.F.'s parents "are clearly loving and devoted advocates for [R.F.] who know [him] and [hi]s challenges very well and have taken a very active role in [hi]s educational programming throughout [hi]s lifetime." Admin. R., Ex. 2 ("Decision") at 17. The court also agrees that the "District personnel presented as knowledgeable and experienced professionals dedicated to their fields." *Id.* The court also notes that while this opinion frequently references the minor plaintiff's "average" or "on-grade level" abilities, he appears to be a very bright student in the area of mathematics.

[2] The record does not contain the exact date the parents filed their due process complaint; however, the record contains a letter from their counsel to the District dated June 23, 2017, informing the District of their decision to appeal. Admin. R., Ex. 11 at 1.

[3] Per Rule 5.2 of the Federal Rules of Civil Procedure, the court refers to the plaintiff by his initials throughout the opinion and redacts any references to his actual name in the record by including his initials in brackets. The court recognizes that the plaintiff's father has the same initials, but all references to R.F. in this opinion refer to the minor plaintiff.

On September 28, 2018, the plaintiffs moved for judgment on the administrative record and voluntarily withdrew their claims under section 504 of the Rehabilitation Act and the ADA. *See* Pl's Mot. for J. on the Admin. R. at 1 n.2 ("The Parents voluntarily withdraw their claims asserted under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act as the same relief requested under those two laws is available to the Family's claims under IDEA and Chapter 14."), Doc. No. 9.[4] The defendant filed a response in opposition to the motion on October 31, 2018, Doc. No. 10, and the plaintiffs filed a reply brief on November 14, 2018. Doc. No. 11. On December 4, 2018, the court heard oral argument on the motion. Doc. No. 12.

The motion is ripe for disposition.

## II. DISCUSSION

### A. Standard of Review – Motions for Judgment on the Administrative Record

"When a federal district court reviews state administrative proceedings, it '(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.'" *Colonial Sch. Dist. v. G.K. by & through his parents A.K. and S.K.*, 763 F. App'x 192, 196 (3d Cir. 2019) (quoting 20 U.S.C. § 1415(i)(2)(C)). In an IDEA case, "the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). Under the modified *de novo* standard,

> "[f]actual findings from the administrative proceedings are to be considered prima facie correct. 'If a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities.'" *S.H. v. State–Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (quoting *MM v. Sch. Dist. of Greenville*

---

[4] The court does not discuss the District's compliance with the ADA or Rehabilitation Act because the plaintiffs dropped these claims. As such, factual information related to the District's 504 Plan is only included to the extent it provides context for the plaintiffs' IDEA claim.

*Cnty.*, 303 F.3d 523, 531 (4th Cir. 2002)). "Within the confines of these standards, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate." *D.S.[ v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (citations omitted); *see also Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (describing a district court's burden as "unusual" in that it must make its own findings by a preponderance of the evidence, but nevertheless afford "due weight" to the administrative officer's determinations).

*Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012).

On the other hand, "the due weight to be afforded to the administrative proceedings is not implicated with respect to issues of law, such as the proper interpretation of the [IDEA] and its requirements; that is, the district court owes no deference to conclusions of law drawn by a state or local educational agency." *In re Educ. Assignment of Joseph R.*, 318 F. App'x 113, 118 (3d Cir. 2009) (alteration in original) (citations and internal quotation marks omitted). However, "[a] District Court must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion. In this context the word justify demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court." *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (quotation marks and citations omitted).

"[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist.*, 680 F.3d at 270 (footnote and citations omitted). Here, the plaintiffs "bear[] the burden of persuasion in the case at bar[,]" *Jack J. through Jennifer S. v. Coatesville Area Sch. Dist.*, Civ. A. No. 17-cv-3793, 2018 WL 3397552, at *7 (E.D. Pa. July 12, 2018), and "to prevail on the IDEA claim, the [plaintiffs] must to [sic] demonstrate that the District did not provide a FAPE." *J.G. v. New Hope-Solebury Sch. Dist.*, 323 F. Supp. 3d 716, 724 (E.D. Pa. 2018). Whether the District provided a FAPE is "subject to clear error review as a question of fact." *Id.* (alterations omitted) (citation and quotation marks omitted).

"Finally, 'claims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law.'" *Id.* (citation omitted).

## B.  Factual History[5]

The plaintiffs appeal from the Hearing Officer's denial of their claims under the IDEA. The court will describe the material facts delineated by academic year and conclude by discussing the Hearing Officer's decision.[6] Except as otherwise noted, the court adopted all factual findings by the Hearing Officer.[7] *N.M. ex rel. W.M. v. Cent. Bucks Sch. Dist.*, 992 F. Supp. 2d 452, 455 n.1 (E.D. Pa. 2014).

### 1.  2013-2014: R.F.'s Second-Grade Year[8]

During the 2012-2013 school year, R.F. attended Colts Neck Township School ("Colts Neck") in New Jersey. S-6 at 1; Decision at ¶ 1. Colts Neck provided R.F. with special education services through an IEP. P-3 at 1; Decision at ¶ 2. According to the Colts Neck "Educational Assessment" ("EA") dated January 3, 2013, presumably administered during R.F.'s first-grade year, Colts Neck administered several tests to analyze his intellectual abilities, including the Woodcock-Johnson III Tests of Achievement ("WJ-III"). S-6 at 3–9; S-7 at 5. The WJ-III test analyzed R.F.'s reading, math, written language, and oral language skills and he scored in the

---

[5] The parties provided duplicate exhibits to the Hearing Officer during their administrative proceeding. Generally, the Hearing Officer referenced only one of the duplicate exhibits. *See, e.g.*, Admin. R., Ex. 7 at 38. The court will do the same. The court also references the District's and plaintiffs' exhibits according to the exhibit number as presented to the Hearing Officer (*e.g.*, P-11). The District's exhibits ("S") are in the administrative record as Exhibit 9. The plaintiffs' exhibits ("P") are in the Administrative Record as Exhibit 10.

[6] Prior to R.F.'s transfer to Colt's Neck in New Jersey, he attended Avonworth Elementary School in Pittsburgh, Pennsylvania for kindergarten. S-4 at 1. During that time, R.F. obtained "final" year-end grades consisting of straight A.'s in K-Language Arts (100%), Mathematics (98%), Art (100%), Computer (96%), Music (94%), and Physical Education (96%). *Id.*

[7] The court also independently reviewed the record and made "its own findings by a preponderance of the evidence" while also "afford[ing] due weight to the factual findings of the hearing officer." *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 430 (3d Cir. 2013) (citing *L.E.*, 435 F.3d at 389). As such, the court cites to both the Hearing Officer's factual findings when applicable and also provides additional discussion from its own review of the record.

[8] The record also includes R.F.'s second-grade "progress report" dated 2013-2014. S-8 at 1. During the fourth quarter of R.F.'s second-grade year he earned threes or higher; a score of three correlates to an "accomplished" rating in all subjects (literacy, mathematics, science, social studies). *Id.*

"average" range for the majority of tested areas—he obtained a few "low average" scores in areas related to reading and several "high average" or superior scores in areas related to math. S-6 at 8, 9.

Colts Neck also conducted a psychological examination of R.F. on January 8, 2013 and January 11, 2013. S-7 at 1. The psychological evaluator administered the Wechsler Intelligence Scale for Children, Fourth Edition ("WISC-IV"). *Id.* On balance, R.F. obtained average results on the WISC-IV in all areas but verbal comprehension. S-7 at 5 (scoring "low average" in verbal comprehension, "average" in perceptual reasoning, "average" in working memory, "average" in processing speed, and obtaining average "Full Scale IQ" score of 98). According to the evaluator, R.F.'s WISC-IV results indicated "slight weaknesses . . . in word knowledge and common sense social judgment[,]" but noted that "[a]ll other areas were within the average range." *Id.* Based on these results, Colts Neck developed R.F.'s January 2014 IEP. Hearing at 115–16 (confirming that S-6 and S-7 are part of same evaluation). This IEP included eight goals (four in area of speech and language, three in area of motor skills, and one in area of daily living skills) and school-provided speech and occupational therapy, each for one hour a week. P-3 at 12–13; Decision at ¶ 3.

### 2. 2014-2015: R.F.'s Third-Grade Year

After completing his second-grade year in New Jersey, R.F.'s parents moved to the District at the beginning of his third-grade year. P-4 at 1 (registering R.F. at Southern Lehigh School District on August 15, 2014).[9] To accommodate R.F.'s needs, the District initially provided him

---

[9] The court notes that the Hearing Officer states that R.F. moved to the District in January 2014, Decision at ¶ 1; however, this appears to be an error because, if true, R.F. would have moved during his second-grade year and required services from the District during that time. *Id.* at ¶ 7 (describing R.F. as starting his third-grade year in the District). The court does not adopt this factual finding because the non-testimonial record evidence indicates that R.F. enrolled in the District in August 2014. P-4 at 1; *see S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) ("A federal district court reviewing the administrative fact finder in the first instance is similarly required to defer to the [administrative law judge's] factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." (footnote omitted)).

with the services required under his out-of-state IEP. S-10 at 1; Hearing at 53;[10] Decision at ¶ 7. Per IDEA requirements, the District sought permission to evaluate ("PTE") R.F. in order to prepare his new IEP on September 11, 2014. S-9 at 1. R.F.'s mother consented on the same day for the initial evaluation. *Id.* at 2. The PTE allowed the District to test R.F.'s present levels of functioning and determine his educational needs. *Id.* at 1; Decision at ¶ 7.

On November 10, 2014, the District issued its first "Evaluation Report" ("ER"). S-10. This ER included input from R.F.'s teachers, parents, an evaluation from the school psychologist, and the results of several school-administered standardized tests and assessments. *Id.* On balance, R.F. obtained average scores in reading and writing and above-average scores in math. *See, e.g.*, *id.* at 3–4 (describing R.F.'s WIAT-III scores as generally in the "average" range for all areas aside from "early reading skills" (below average), mathematics (above average), and numerical operations (very superior)); Decision at ¶¶ 8–10 (describing the November 2014 ER results as indicating "no significant academic achievement concerns"). The ER also indicated that R.F. required assistance for speech and language and occupational therapy. S-10 at 21–23; Decision at ¶¶ 20–21.

The District made several findings based on the November 2014 ER, namely that: (1) R.F. "demonstrate[d] Average intellectual functioning and academic achievement and [did] not require special education supports to meet his needs[,]" S-10 at 4 (emphasis omitted); (2) R.F. qualified for "speech-language therapy services to improve thought organization for narrative language skills and improve pragmatic and prosodic aspects of speech to increase speech intelligibility during conversational exchanges[,]" *id.* at 8 (emphasis omitted); (3) R.F.'s vision, while impaired slightly, did not qualify for vision services, *id.* at 9; (4) R.F. has an "Auditory Processing

[10] The hearing appears in the Administrative Record in three volumes. Volume I includes pages 1–238. Admin. R., Ex. 7. Volume II covers pages 241–486. Admin. R., Ex. 6. Volume III spans pages 489–662. Admin. R., Ex. 5. The hearing transcript is consecutively paginated across the three volumes. As such, the court refers to the hearing transcripts collectively as "Hearing" throughout the opinion.

Disorder[,]" *id.* at 13 (emphasis omitted); (5) R.F. did not require school-supplied physical therapy, *id.* at 14; (6) and R.F. would "benefit from continued Occupational Therapy[,]" *id.* at 19; *see also* Decision at ¶¶ 16–21.

Based on the November 2014 ER, the District prepared an IEP dated December 8, 2014 ("December 2014 IEP").[11] The December 2014 IEP included the modifications and Specially Designed Instruction ("SDI") listed below. The District planned for all of the modifications and SDIs below to run from December 10, 2014 to December 8, 2015. The modifications and SDI provided in the December 2014 IEP were as follows:[12]

| Modifications and SDI | Location | Frequency |
| --- | --- | --- |
| Multi-sensory techniques for improved speech intelligibility, Visualizing and Verbalizing strategies for improved thought organization | speech classroom | lXweek-30 mins. with the exception of building/district programs and/or absence. Therapy will begin the third week of school and end two weeks prior to the last day of school. |
| Earobics Program | home | Per[] program specifications |
| An assistive listening device such as classroom sound field is recommended to improve classroom signal to noise ratio and assist [R.F.]'s performance in background noise. | classroom | daily |
| Use of visual cues and examples [to] assist [R.F.'s] understanding of verbal messages. | classroom | daily |
| [R.F.] may need tests presented in a quiet area without distractions. He may require extra time to process oral directions. | classroom | as needed |
| In group instruction [R.F.] should be seated away from noise sources and visual distractions. | classroom | daily |

[11] The copy of this IEP in the record is labeled "Draft Version" and the document is dated May 2013 but noted as being last saved on December 8, 2014 at 8:09 p.m. *See* S-11 at 2; P-11 at 3. The Hearing Officer refers to this IEP as the "12/9/2014 IEP" and confirmed that the District provided services to R.F. pursuant to this IEP beginning in his third-grade year and "carried [it] into the 4th grade[.]" Hearing at 203, 504.

[12] The court copied this table verbatim from the IEP as to the first two columns. Because the columns titled "projected beginning date" and "anticipated duration" were the same for all categories, the court did not include said columns in the table.

| | | |
|---|---|---|
| If [R.F.] requests repetition he should first repeat what he has heard allowing teachers and staff to complete the message rather than repeat in entirety. | classroom | daily |
| [R.F.] may benefit form [sic] use of metacognitive devices to assist his memory trace. Techniques such as [the] use of mnemonic devices, putting information to a rap beat or music, pairing each item in a list of information to a raised finger are examples of devices that may cue memory. | classroom | as needed |
| Frequent movement breaks embedded in classroom routine throughout the day. Opportunities to manipulate items and materials on a regular basis during [sic][.] | classroom | daily |
| Assess need for reduction in writing requirements due to fatigue or if work; Develop clear expectations of written work including legibility and spacing; Develop a positive reinforcement program to encourage the student to be motivated to complete written work with the expectation of legibility and proper spacing[.] | classroom | daily |
| Copy notes written by another student who is a good note-taker to reduce the amount of writing the student is completing in a typical school day; Provide an upper visual boundary (drawing a line) on papers that have one line only for answers to help him remain within the boundaries for writing[.] | classroom | daily |
| Monitor [R.F.'s] ability to keep pace with written work and assess need for technology if a deficit is noted[.] | classroom | monthly |

S-11 at 18–19;[13] Decision at ¶¶ 22–26.

---

[13] During R.F.'s third-grade year, he received "regular" education reading interventions through the District's Tier 2 Response to Intervention ("RtII") instruction and participated in the Sonday program to assist with his "decoding skills." Hearing at 548–49. The District also provided R.F. with a license to use an "Earobics" program at home per his IEP's SDI; however, according to District employees, R.F. did not continuously use the program. *See, e.g.*, S-16 ("[R.F.] did not use Earobics at home"); Hearing at 512–13 ("He was [using the Earobics program] in the beginning. And then the compliance dropped off, and he stopped using the program.").

The December 2014 IEP noted that R.F. "read[] on grade level" and "demonstrate[d] strong academic proficiency, performing in the average range across reading, math, and writing tasks." S-11 at 7. The December 2014 IEP also included two "measurable" annual goals: (1) [R.F.] "will produce grade level language, demonstrating competency in form, content, and use in the 4/5 opportunities over three consecutive sessions[;]" and (2) "[R.F.] will demonstrate the ability to motor plan and organize himself so that he completes presented assignments in the time frame expected (equal with his peers) 3 out of 4 times across 6 data collection points." *Id.* at 16; *see* Decision at ¶ 23 (noting reduction from eight goals in Colts Neck IEP to two goals). R.F.'s IEP further included five "short term objectives" related to his speech abilities and incorporated the SDIs previously identified in the IEP.[14] S-11 at 16–19. The IEP called for R.F. to spend 99% of the day in the "regular" classroom. *Id.* at 23.

During R.F.'s third-grade year, the District tracked his progress and conducted several progress check-ins. S-15. In January 2015, during the first IEP progress interval, the District's speech language pathologist, Linda Milliman ("Milliman"), noted R.F. made "satisfactory progress" towards his speech and language goals. *Id.* at 1; Hearing at 513. In April 2015, during the second progress interval, Milliman noted that R.F. "demonstrated 80% accuracy for accurately imitating the clinician's model for word stress within sentences and 70% accuracy for chunking of

---

[14] The first three short-term objectives (also referred to as "benchmarks" in the IEP)—related to R.F.'s expressive language annual goal—called for him to: (1) "[d]uring auditory feedback activities, . . . produce a more deliberate, exaggerated oral-motor response pattern with 90% accuracy over three consecutive sessions[;]" (2) "demonstrate the ability to modify prosodic elements of speech (i.e., rhythm, vocal loudness, syllable and word stress, etc.) to vary the meaning of sentences with 90% accuracy over three consecutive sessions[;]" and (3) "[u]sing Visualizing and Verbalizing Program strategies, . . . produce an oral narrative (including the characters, setting, goals, problem, and solution) using appropriate temporal language and varied transition words in 4 out of 5 opportunities over three consecutive sessions." S-11 at 16. The last two short-term objectives, related to R.F.'s motor planning, written work, and organizational skills, aimed for him to demonstrate the ability to: "compelte [sic] written work as presented in legible writing within the expected time fram [sic] set forth by the teaching staff[]" and "attend to instruction and completion [sic] of tasks when afforded the opportunity to change positions while seated, movement breaks built into his school day, and with verbal cues as needed." *Id.* at 17.

words within phrases using appropriate breath support for fluent speech" but further noted that when the District tested R.F. without a model, he had some difficulty sequencing syllables and organizing thoughts. *Id.* at 1. Milliman also noted that R.F. "appear[ed] to enjoy working in a small group setting with one other peer." *Id.* During the third progress interval in June 2015, R.F. continued to show improvement and exhibited "90% accuracy for correctly imitating the clinician's model for prosody activities in the following areas: speech rate, volume, word stress." *Id.* at 2. Milliman also noted that R.F. sometimes requires cues, but that he "demonstrated the ability to correctly sequence 7/7 story frames and described the basic elements of the story." *Id.*

At the conclusion of R.F.'s third-grade year in the spring of 2015, the District obtained several additional data points on his progress, namely his Pennsylvania System of School Assessment ("PSSA") scores and year-end grades. On his Spring 2015 PSSAs, R.F. scored "proficient" in English/Language Arts and "advanced" in Mathematics. S-13 at 1. R.F. also obtained passing grades in all his third-grade classes. S-14 at 2 (obtaining B+ in Reading, "S" for satisfactory in Writing/Communication and Science, A- in Math, and "N" for needs improvement in Handwriting).

### 3.     2015-2016: R.F.'s Fourth-Grade School Year

During R.F.'s fourth-grade year, the District viewed his progress positively because he was "mastering" his IEP goals; however, his parents became dissatisfied with his progress *and* the District's special education services. *See* Hearing at 70 (describing R.F. at end of his third-grade year as "still having issues" with reading). To determine whether R.F. qualified for additional services under his IEP, R.F.'s parents hired a private evaluator to conduct several assessments of him. Decision at ¶ 27; Hearing at 66–68.

a. The Private Evaluation

The parents hired Dr. Kimberly Flounders to assess R.F.'s abilities using the Woodcock Reading Mastery Test-III in October 2015. P-14; Decision at ¶ 27. Dr. Flounders determined that R.F.'s

> high scores on the WRMT-III, while nearly two grades below his current grade level, involved the two areas of Word Identification and Oral Reading Fluency and fell in the *Below Average* range. Every other subtest fell within the *Well Below Average* range, with his two lowest scores in the areas of Listening Comprehension and Passage Comprehension.

P-14 at 1; *see* Decision at ¶¶ 28–29 (finding that Dr. Flounders' report indicated that R.F. performed "two grades below the then current grade level" in reading). Dr. Flounders recommended another evaluation (from a speech language pathologist) and "language processing support services to build his receptive and expressive skill acquisition." P-14 at 1–2. R.F.'s mother admitted that she believed some of Dr. Flounders' results were inaccurate, namely that they were "a little low." Hearing at 73; *see also id.* at 163 (describing Dr. Flounders' results as lower than R.F.'s actual performance abilities).

b. The District's Reevaluation

In advance of R.F.'s third-grade IEP's expiration in December 2015, the District sought the parents' consent to reevaluate him on November 16, 2015. S-17. While the District did not successfully obtain the parents' consent prior to the reevaluation, *id.* at 3, the District nevertheless reevaluated R.F. prior to his third-grade IEP's expiration.[15] During the reevaluation process, the

---

[15] The record includes a "contact log" prepared by District's speech/language pathologist, Carol Macomb ("Macomb"), wherein she tracked her attempts to contact the parents and obtain their permission to reevaluate R.F. *See* S-18 (noting that she attempted to contact the parents on November 13, 2015; November 16, 2015; November 25, 2015; December 7, 2015; and December 11, 2015); Hearing at 167, 207–08 (testifying about preparation of log). R.F.'s mother testified that she never received any messages or notice of the RE. *See, e.g.*, Hearing at 127 ("A. They did not reach out to me. That letter was inaccurate in the report."). It appears that the District conducted the RE without permission from the parents and, upon receiving the evaluation report, the parents declined their consent and provided the District with their private evaluation materials. Hearing at 212 (describing parents as sending District their private evaluation materials after sending RE home). *Compare* P-15 at 2 (declining consent to 2015 RE on December 5,

District reviewed R.F.'s records and his teacher's impressions of his abilities. S-19; *see* Hearing at 518 (describing review progress as looking at R.F.'s "data, his progress monitoring in the speech room" and discussion with his teachers). The District initially limited the reevaluation to a records review because the District comprehensively tested R.F. a year prior and intermediately tested him throughout the year which "showed his language skills to be in the average range." Hearing at 518. In addition, "[R.F.] was achieving 90 percent accuracy in the objectives that [the District was] instructing him on. And he continued to demonstrate that accuracy level." *Id.*

The school issued a final RE on December 4, 2015 ("December 2015 RE"). S-19 at 2.[16] In the December 2015 RE, the District found that R.F. "demonstrat[ed] satisfactory progress within the classroom setting" and "mastered all of his speech and language goals." *Id.* at 5.[17] Due to R.F.'s progress, the District concluded that he "no longer qualifie[d] for school based speech and language support services." *Id.* The District further concluded that R.F. remained eligible for "classroom accommodations to address" his APD through a "504 Service Agreement" but that he

---

2015), *with* S-19 at 1 (sending parents results of 2015 RE on December 4, 2015). The parents also sent a letter to Macomb on December 7, 2015, indicating that the District should not test R.F. again because private service providers recently evaluated his speech and occupational therapy ("OT") needs. S-20. The Hearing Officer found the District violated the IDEA's procedural requirement to give notice to the parents prior to conducting the December 2015 RE; however, he found that it did not rise to "the level of an actionable substantive or procedural violation" because the error was harmless. Decision at 21–22. Neither party seeks review of the Hearing Officer's decision on this point. As such, the court does not discuss whether it was proper.

[16] The Hearing Officer erroneously refers to this report as the "District's Second IEP – December 2015[.]" Decision at 6. The Hearing Officer cites to, and discusses the substance of, the December 2014 IEP. *See id.* at ¶ 34 (referencing, *inter alia*, December 2014 IEP at exhibit P-11). The District did not prepare a December 2015 IEP. *See* P-3 (January 2014 Colt's Neck IEP); P-11/S-11 (December 2014 District IEP); S-29 (December 2016 District IEP); S-33 (February 2017 revisions to December 2016 District IEP). However, this error is harmless because the Hearing Officer correctly analyzed the December 2014 IEP, P-11/S-11, as to R.F.'s third-grade year and does not discuss a "December 2015" IEP in his analysis. Decision at 22 (referencing December 2015 RE, not December 2015 IEP). To the extent the Hearing Officer references in a fourth grade IEP, it is the court's understanding that he is referring to the third grade IEP's continuation into R.F.'s fourth grade year. *See* Decision at 23 ("In short, the 4th-grade IEP was reasonably calculated to enable the Student to achieve passing marks and advance from grade to grade.").

[17] On December 4, 2015, the District, through Macomb, mailed the parents a copy of R.F.'s reevaluation report which concluded that he no longer qualified for "school based speech and language services" but that he did qualify for a 504 Plan to accommodate his APD. S-19 at 1.

no longer required SDI. *Id.*; Decision at ¶ 35.[18] The parents disagreed with the District's determination that R.F. no longer qualified for SDI and did not believe that a 504 plan would sufficiently address his learning disabilities. S-19 at 13; Decision at ¶ 37. As a result, the parents returned the "Notice of Recommended Educational Placement/Prior Written Notice (NOREP/PWN)" ("NOREP") to the District on December 11, 2015, and designated their disapproval of the District's decision to exit R.F. from SDI. S-19 at 13; Decision at ¶ 37. On December 10, 2015, the parents also requested the District conduct a comprehensive evaluation of R.F. and indicated their desire to mediate the dispute. S-19 at 13.[19]

On December 20, 2015, the parents informed the District via e-mail that they withdrew their request for mediation because they agreed with the District's compromise to continue providing R.F. services under his third-grade IEP until a reevaluation was completed. S-21 at 1; Hearing at 558–59 (describing District's decision to continue providing services under R.F.'s earlier IEP until reevaluation completed).[20] In the same e-mail, the parents provided the District with private reports regarding R.F.'s abilities and informed the District that he received private speech and OT services outside of those provided by the District. *Id.* at 1–15.[21] Prior to the parents'

---

[18] Although not specifically identified by the parties or the record, it appears that an IEP "[p]rovides individualized special education and related services to meet a child's unique needs," whereas a 504 plan "[p]rovides services and changes to the learning environment to enable students to learn alongside their peers." *The Difference Between IEPs and 504 Plans*, UNDERSTOOD, https://www.understood.org/en/school-learning/special-services/504-plan/the-difference-between-ieps-and-504-plans (last visited July 31, 2019) (emphasis omitted).

[19] On December 7, 2015, the parents wrote to Macomb stating that they received their requested RE but that R.F. was recently tested and was also receiving private speech and OT services. S-20 at 1. The parents stated that because R.F. was recently tested, he should not be retested so frequently per the advice of their private evaluator. *Id.*

[20] While implementing the third-grade IEP into R.F.'s fourth-grade year, the District continued to review R.F.'s progress towards his IEP goals into his fourth-grade year because the District extended his third-grade IEP during the reevaluation process. In January and April 2016, R.F. met all of his speech goals. S-24 at 2 (noting R.F. displayed "[c]ontinued mastery of all goals and objectives" in April 2016). R.F.'s OT IEP progress reports also indicated that he generally paid attention in class, even though he may have appeared to be not paying attention, and he changed position frequently. S-24 at 5.

[21] The parents attached several private reports to their December 20, 2015 e-mail to the District. The first report attached was a February 29, 2012 "Functional Vision Evaluation" prepared by Dr. Robert W. Prazer. *See* S-21 at 2–3 (stating that, *inter alia*: (1) R.F.'s uncorrected vision is 20/25 in his right eye and 20/20 in his left eye and that he "struggl[ed] in the areas of visual efficiency and visual processing skills[;]" (2) R.F.'s "visual deficiencies are definitely contributing to his difficulties tracking/keeping [sic] her place while reading[;]" and (3) R.F. exhibited

December 20, 2015 notice, the District did not know that R.F. underwent private speech and language evaluations or received private therapies. Hearing at 210.

On January 4, 2016, the District sought the parents' permission to reevaluate R.F., and the parents consented on January 11, 2016. S-22 at 1, 3. On March 11, 2016, the District provided the parents with the RR ("March 2016 RR"). S-23 at 10; Decision at ¶ 38. The March 2016 RR included a review of R.F.'s testing history,[22] academic progress, and a summary of recent observation results by his teachers, the school psychologist, occupational therapist, and guidance counselor.[23] S-23 at 11–44. The March 2016 RR also included the results of various tests and

_____

"Exophoria, Accommodative Insufficiency, and Ocularmotor Syndrome[;]" and (4) R.F. would benefit from "optometric vision therapy" to assist with his visual processing skills. The second report, a "Developmental Optometric Examination" prepared by Dr. Errol Rummel on October 29, 2013, also addressed R.F.'s vision. S-21 at 4. Dr. Rummel found that certain difficulties with R.F.'s vision impaired his ability to read and process visually. *Id.* The parents also included a private OT evaluation, *see id.* at 5–7 (finding that, *inter alia*, R.F. displayed difficulty with "handwriting, VMI, manual dexterity, B UE/core strength"), and a "Pediatric Speech and Language Evaluation" prepared by Valley Family Therapeutics on September 29, 2015. *Id.* at 8–13 (finding that, *inter alia*, R.F. "demonstrates moderately to severely delayed auditory processing skills characterized by difficulty retaining simple sequences of auditory information and manipulating simple sequences of auditory information with numbers and/or words as well as difficulty retaining details in sentences of increasing length and grammatical complexity. Speech, voice and fluency skills appear within normal limits at this time. Social/pragmatic skills are characterized by a shy and well-behaved personality with age-appropriate attention and activity levels[]" (emphasis omitted)). Lastly, the parents included a report prepared by Dr. Flounders on October 16, 2015. *Id.* at 14. The parents hired Dr. Flounders to privately administer the Woodcock Reading Mastery Test-III for the purpose of determining eligibility for Wilson Reading instruction. *Id.* As described above, Dr. Flounders found R.F. below average in several areas related to his writing and reading abilities and determined that he has a "strong need for an SLP evaluation and language processing supportive services[.]" *Id.* at 15.

[22] The March 2016 RR also included a review of R.F.'s 2012 and 2013 vision tests and noted that the District lacked current eye examinations. S-23 at 30–32. Based on the discussion included in the March 2016 RR, the District determined that R.F. did not appear to have vision problems as based on its review of the 2012 and 2013 reports, its January 2016 classroom observation, and R.F.'s results on the Pennsylvania Framework for Functional Vision and Learning Media Assessment. *Id.* at 30–32. On balance, the District determined that R.F. is "able to visually access all of his educational materials" and does not require SDI or qualify as "a student with a visual impairment." *Id.* at 32.

[23] Of note are the results of the school psychologist's observations using the Behavior Observation of Students in Schools ("BOSS") methodology. The school psychologist observed R.F. on February 8, 9, and 17, 2016. S-23 at 19. On February 8, 2016, the psychologist observed R.F. during his "English Language Arts" instruction and determined that he "was engaged for 74% of the intervals, while his peers were engaged for 66% of the intervals." *Id.* at 20. She noted that "[R.F.] exhibited higher levels of engagement and lower levels of off-task behavior than his peers." *Id.* She also noted that R.F. required verbal prompts to "look awake" towards the end of instruction, but that he "followed all whole class directions, even when the teacher did not provide an individual or verbal cue." *Id.*

On February 9, 2016, the psychologist observed R.F. during math instruction. *Id.* During math, R.F. "was engaged for 92% of the intervals, while his peers were engaged for 75% of the intervals" and he "exhibited higher levels of engagement and lower levels of off-task behaviors than his peers." *Id.* The psychologist noted that R.F. appeared "focused throughout the observation." *Id.*

evaluations, such as the WISC-V (administered on February 24, 2016), WIAT-III,[24] BASC-2 (completed in February 2016), and the Social Skills Improvement System ("SSIS") (also completed in February 2016). *Id.* at 25, 29, 30.

On the WISC-V, R.F. obtained average or better scores aside from "working memory" in which he obtained a below average score. *Id.* at 25. On the WIAT-III, R.F. obtained average or better scores on all areas tested, including areas related to reading. *Id.* at 27. On the BASC-2, a behavioral assessment, R.F.'s parents, his English Language Arts/Social Studies teacher (Ms. Dill), and his Math teacher (Ms. DeSanctis) all rated him in different areas related to his social skills. *Id.* at 29. His teachers both rated him in typical range for all areas aside from "withdrawal." *Id.* However, R.F.'s parents rated him in the "at-risk" category for several categories and rated him in the "clinically significant" range for "withdrawal." *Id.* Concerning the SSIS, which was administered to Ms. DeSanctis, Ms. Dill, and R.F.'s parents, R.F.'s teachers rated him as "average" in most areas, aside from "below average" in communication and engagement, *id.* at 30, whereas his parents rated him as "below average" in four out of the seven "Social Skills Subscales[.]" *Id.* On the "Problem Behaviors Subscales[,]" his teachers rated him as "above average" for internalizing and autism spectrum but average for externalizing, bullying, hyperactivity/inattention. *Id.* His parents rated him as average for each of those categories other than autism spectrum. *Id.*[25]

---

On February 17, 2016, the psychologist again observed R.F. during his "English Language Arts" instruction. During this observation, R.F. "was engaged for 46% of the intervals, while his peers were engaged for 84% of the intervals." *Id.* She noted that compared to her other observations, R.F. appeared to be less engaged during the February 17, 2016 interaction. *Id.* During the psychologist's observation of R.F. during recess, she pointed out that he played games with peers and "appeared to participate appropriately[.]" *Id.* at 21. R.F. also appeared "laughing and smiling while playing." *Id.* The psychologist noted that R.F. appeared to be "initiating interactions with his peers." *Id.*

[24] The March 2016 RR does not state when the District administered this evaluation.

[25] To the extent R.F.'s parents argue that R.F.'s IEPs failed to include goals or SDI for his social issues, Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for J. on the Admin. R. ("Pl.'s Mem.") at 2, Doc. No. 9, the District did not violate the IDEA by failing to include additional social supports given the conflict between the teachers' observations and the parents' reported concerns. *See, e.g.*, S-33 at 284 (noting that R.F. appeared to be adjusting to school and had one

16

Macomb performed a series of tests to determine R.F.'s speech abilities. *Id.* at 33 (administering Comprehensive Assessment of Spoken Language ("CASL"), Test of Narrative Language, and the Clinical Evaluation of Language Fundamentals ("CELF") 4th Edition, Four Formulated Sentences Subtest). R.F. scored in the average range on all the tests Macomb administered. *See id.* at 34 ("[R.F.'s] overall performance for the . . . []CASL[] placed his performance within the average range for his chronological age. He obtained a standard score of 107, which placed his receptive and expressive language abilities at the 68th percentile."), *id.* at 35 ("[R.F.] achieved an overall Narrative Language Ability Index of 121, which placed his narrative discourse skills in the 92nd percentile for his chronological age."); *id.* (showing CELF results as "[R.F.] received a standard score of 12, which placed in the 75th percentile for his chronological age").

As to R.F.'s purported physical disabilities, the District's physical therapist ("PT") and occupational therapist both evaluated him. The PT evaluated R.F.'s physical therapy needs based on the parents' reported concerns (*e.g.*, low muscle tone, "possible mild Cerebral Palsy"); however, the PT concluded that R.F. did not have any significant physical limitations. *Id.* at 23–24. The occupational therapist evaluated R.F. using a variety of assessments, namely an ecological assessment, Wide Range Assessment of Visual Motor Abilities ("WRAVMA"), handwriting tasks, Detroit motor speed and precision test, Wold sentence copying test, and Wold digit symbol test. *Id.* at 35. On the WRAVMA, a test to assess R.F.'s skills in the areas of "Visual-Motor, Visual-

---

strong friendship); *see also Timothy F. v. Antietam Sch. Dist.*, Civ. A. No. 12-2719, 2014 WL 1301955, at *6 (E.D. Pa. Mar. 31, 2014) (finding no error in hearing officer's acceptance of school's social skills ratings over parents' "unduly negative" scores because, in part, "[t]he teacher and psychologist see Student in the most relevant setting, they have expertise in evaluating students, and they may have a greater perspective for comparison due to their experience with many different children"); *N.M. ex rel. W.M.*, 992 F. Supp. 2d at 470 (finding parents did not satisfy their burden to show school failed to provide an IEP addressing student's social needs when teacher observation and testing scores differed thereby producing "evidence . . . in both parties' favor[]"). Further, at the request of the parents, the District included social skills SDIs in the February 2017 IEP. *See* S-33 at 22 (adding guidance counselor lunch group to R.F.'s IEP); Decision at ¶ 90.

Spatial, and Fine Motor[,]" he obtained scores in the average range for all categories. *Id.* at 35–36. The occupational therapist also tested R.F.'s hand skills and motor skills and noted some difficulties (related to his "awkward grasp pattern") but found, on balance, that R.F. successfully completed the handwriting and copying tests. *Id.* at 37–38.

Overall, the District's March 2016 RR concluded that R.F.'s "overall cognitive ability fell within the Average range, with strengths in verbal comprehension skills and a weakness in working memory." *Id.* at 38. In the area of Reading, the District found R.F.'s current data "very inconsistent with the scores received in the private evaluation completed by Kim Flounders." *Id.* As a result, the District again determined that R.F. no longer qualified for SDI, but that a 504 Plan would properly accommodate his needs. *Id.* at 40; Decision at ¶ 43.

The parents sent a letter dated March 29, 2016 via e-mail to the District indicating their disagreement with the March 2016 RE and requesting a publicly funded IEE. P-24 at 1–2 (noting parents withdrew December 2015 publicly funded IEE request). On April 8, 2016, the parents returned a NOREP ("April 2016 NOREP") to the District indicating that they both approved and disapproved of the recommendation. P-25 at 8. Specifically, the parents agreed with the implementation of a 504 Plan, but they did not agree with the District's decision to exit R.F. from services. *Id.* On the April 2016 NOREP, the parents also withdrew their March 29, 2016 request for a publicly funded IEE, but "reserve[d] [the] right to request reimbursement for an IEE in the future." *Id.*; *see also* P-24 at 1–2; Decision at 8.

In response, the District ceased providing "direct speech and language supports, specially-designed instruction and OT," Decision at ¶ 45, and prepared a 504 Service Agreement ("504 Plan"), outlining the following "adaptation, modification, service, or related aid":

- Provide opportunity to change position and movement breaks
- Verbal prompts for attention when needed

- Allow use of technology for longer writing assignments to include the use of a computer or the use of talk to text feature
- Use finger or reading window to assist with tracking while reading
- Assistive listening device such a as a classroom sound field (FM system)
- Use of visual cues and examples will assist [R.F.'s] understanding of verbal messages
- [R.F.] may needs [sic] tests presented in a quiet area without distractions
- [R.F.] may require extra time to process oral directions
- Seat [R.F.] away from noises and distractions
- If [R.F.] requests repetition, he should first repeat what he has heard
- Use of mnemonic devices to aid in recall of information
- Prompting to reread /revise or use of editing checklists at the completion of each writing assignment[]
- Provide a copy of teacher notes or peer notes
- Provide clear expectations of written work including legibility and spacing and positive praise for neat handwriting
- Provide an upper visual boundary (drawing a line) on papers that have one line only
- Provide graphic organizers for writing tasks
- Teacher support for writing tasks (which are not direct assessments) that require incorporating information from multiple sources[]
- Teacher check-ins during writing tasks to ensure that [R.F.] understands the assignment
- As available, provide an extra set of books for use at home
- Post schedules and directions in view of the student with notice of any changes
- Provide simple and concrete directions
- Occupational therapy for 15 minutes per month on a consultative basis

S-23 at 6–7.

The parents approved the 504 Plan on April 15, 2016, and the District planned to begin implementing the Plan on April 25, 2016. *Id.* at 6, 7. However, the District did not finalize the March 2016 RR because the parents never agreed to the District's decision to exit R.F. from services. Hearing at 560.

The District obtained several other data points on R.F.'s academic abilities during his fourth-grade year. As in third grade, R.F. took the PSSAs in the spring. S-25; Hearing at 577. On R.F.'s spring 2016 PSSAs, he obtained a score of "basic" for English and Language Arts and "advanced" for Mathematics and Science. S-25 at 1. R.F. also obtained passing grades at the

culmination of his fourth-grade year (2015-2016); he earned a C+ in English Language Arts 4, an A in Math 4, an A in Science 4, and B+ in Social Studies 4. S-26 at 1. All of R.F.'s teachers noted that he was a pleasure to have in class. *Id.* Specifically, his English and Language Arts teacher noted that he: (1) "[h]as shown improvement"; (2) "[h]as met quarterly goals"; and (3) "[r]eads fluently[.]" *Id.*

### 4. Summer 2016: R.F.'s IEE

Given the parents' disagreement with the District's conclusion that R.F. no longer required special education, they hired Dr. Kara Schmidt during the summer of 2016 to prepare an IEE. Decision at ¶ 48. As part of her IEE, Dr. Schmidt conducted a neuropsychological evaluation of R.F. S-27 at 1. Dr. Schmidt found that R.F. "me[t] criteria for a Specific Learning Disability based upon his needs in spelling and written language" and determined that R.F. "require[d] support and intervention for weaknesses in decoding/phonological working memory, reading fluency/accuracy and general working memory/executive control." S-27 at 21 (emphasis omitted); Decision at ¶ 70. Dr. Schmidt also found R.F. presented with an "Unspecified Communication Disorder" and "Developmental Coordination Disorder." S-27 at 21–22; Decision at ¶ 70. Dr. Schmidt recommended that R.F. continue to receive SDI and several other accommodations, including the ability to "retake tests when he receives grades of a C+ or lower[.]" S-27 at 22–23.

### 5. 2016-2017: R.F's Fifth-Grade Year

In the beginning of R.F.'s fifth-grade year, his parents provided the District with Dr. Schmidt's report. In response, the District evaluated R.F., with the parents' consent, to "conference" the results of the parents' IEE (Dr. Schmidt's report) with R.F.'s "classroom performance to determine if he is a student with an educational disability in need of specially designed instruction." S-29 at 1; Decision at ¶ 71. The District then issued an ER on November

30, 2016 ("November 2016 ER"). S-29; Decision at ¶ 72 (referring to November 2016 ER as "November 30, 2016 RR").

The November 2016 ER included the standard discussion of R.F.'s grades to date in fifth grade, prior testing, and teacher observations. S-29 at 1–12;[26] Decision at ¶ 72.[27] The November 2016 ER noted that R.F. received "90 minutes daily of research-based ELA instruction using the Reading Street curriculum[;]" "30 minutes 5 of 6 cycle days of intervention using the Read Naturally program[;]" and "90 minutes daily of research-based math instruction using the EnVisions curriculum." S-29 at 14; Decision at ¶ 73. The November 2016 ER specifically noted that R.F. appeared to be making progress in the District's regular education RtII programming. S-29 at 12; Decision at ¶ 73.[28]

In section 5 of the report, the District compared Dr. Schmidt's results to their own. *See* S-29 at 14 ("[R.F.'s] overall cognitive ability fell within the average range on both assessments administered by Southern Lehigh and Dr. Schmidt. . . . Although Dr. Schmidt's evaluation indicated a weakness in processing speed, this was not found in the cognitive assessment administered by Southern Lehigh."). On balance, the District found that the results obtained by Dr. Schmidt were "not consistent with [R.F.'s] classroom performance or his performance on

---

[26] This report is also included as P-29.
[27] R.F.'s grades were as follows: Math 5 (B+), Science 5 (B-), Social Studies 5 (A-), and English Language Arts 5 (C+). S-29 at 12.
[28] RtII is "an early intervention strategy" aimed at assisting schools in identifying "academic or behavioral risk" in students early. Admin. R., Ex. 8 ("Hearing Officer Ex.") at 1. The system has three tiers, ranging from Tier 1 (the least intensive level of support, intended to provide a "foundation instruction for all students"), Tier 2 (strategic interventions for "some students"), and Tier 3 (the most intensive level of support for "a few students"). *Id.* at 2. Tier 2 of the RtII program provides:

> [a]cademic and behavioral strategies, methodologies, and practices designed for some students who are not making expected progress in the standards aligned system and who are **at risk** for academic and behavioral failure. Students require additional academic and behavioral support to successfully engage in the hearing process and succeed in the standards aligned system.

*Id.*

academic assessments administered by Southern Lehigh." *Id.* at 14; *see also id.* at 16 ("Teachers report that [R.F.] is social, gets along well with others, and they do not have any behavioral concerns at this time. The social pragmatic deficits, lack of initiation and reciprocal interaction reported in the evaluation completed by Dr. Schmidt are not observed in the school setting."). However, the District agreed with Dr. Schmidt's findings in the area of "written expression" based on their results on the Test of Written Language-Fourth Edition ("TOWL") subtests administered during the November 2016 ER. *Id.* at 13, 17; Decision at ¶ 75.

The November 2016 ER recommended that R.F. continue to receive accommodations through his 504 Service Agreement and 30 minutes of OT. S-29 at 17. The District also concluded that R.F. qualified as a student with a "Specific Learning Disability" in the area of written expression; however, it rejected Dr. Schmidt's determination that R.F. qualified in any other areas of disability. *See id.* at 10 (finding that R.F. was not on autism spectrum); *id.* at 14 (rejecting Dr. Schmidt's test results which indicated that R.F. had dyslexia and WIAT-III reading scores as inconsistent with his classroom performance and progress in RtII reading program); *see also* Decision at ¶¶ 77–78 (noting that District disagreed with Dr. Schmidt's determination that R.F. qualified in area of reading and was dyslexic). As a result, the District prepared a draft IEP in December 2016 ("December 2016 IEP"), which included goals in the area of written expression and the modifications/SDI described in the table below. S-30 at 1, 18–20; Decision at ¶ 83. The District slated all of the proposed modifications and SDIs for implementation from December 17, 2016 through December 15, 2017. S-30 at 19–20.

**Table. December 2016 IEP Modifications and SDIs**

| Modifications and SDIs | Location | Frequency |
|---|---|---|
| Provide opportunity to change position and movement breaks | Across all classes | Daily |

| | | |
|---|---|---|
| Verbal prompts for attention | Across all classes | As [R.F.] demonstrates off-task behavior |
| Allow use of technology for longer writing assignments to include the use of ac computer or the use of talk to text feature | Across all classes | As writing assignments more than 1 paragraph are assigned |
| Use of finger or reading window to assist with tracking while reading | Across all classes | When reading text |
| Use assistive listening device such as a classroom sound field (FM system) | Across all academic classes | Daily |
| Use of visual cues and examples will assist [R.F.'s] understanding of verbal messages | Across all classes | As verbal directions are provided |
| Allow extra time to process oral directions | Across all classes | As verbal directions are provided |
| Seat away from noises and distractions | Across all classes | Daily |
| If [R.F.] requests repetition, he should first repeat what he has heard | Across all classes | Daily |
| Opportunities to take tests in a quiet area without distractions | Across all classes | When tests are assigned |
| Use of mnemonic devices to aid in recall of information | Across all classes | When applicable to memorizing material |
| Prompting to reread /revise or use of editing checklists, opportunities to revise/edit with teacher or aide support | Across all classes | At the completion of each writing assignment |
| OT strategies–Provide clear expectations of written work including legibility and spacing and positive praise for neat handwriting; Provide an upper visual boundary (drawing a line) on papers that have one line only | Across all classes | Daily |
| Provide a copy of teacher notes or peer notes | Across all classes | When students are required to independently take notes |
| Provide graphic organizers for writing tasks | ELA class | As writing assignments are assigned |
| Teacher or aide check-ins during writing tasks to ensure that [R.F.] understands the assignment | ELA [c]lass | At the beginning of each writing assignment[] |
| Provide simple and concrete directions | Across all classes | Daily |

| Post directions with[in R.F.']s view | [A]ll classes | [D]aily |
|---|---|---|
| [M]odified spelling lists (12 words instead of 20) | [G]eneral ed[ucation] classroom where spelling is assigned[] | [W]henever pretesting suggests [R.F.] knows less than 50% of the assigned words[] |

*Id.* The December 2016 IEP also included 30 minutes of OT and "consultation with learning support teacher" on a weekly basis.[29] *Id.* at 20. The December 2016 IEP called for R.F. to be fully integrated into the regular classroom. *Id.* at 29.

On Friday, December 16, 2016, the District held an IEP team meeting. S-30 at 27; S-32 at 3. On December 26, 2016, the parents signed the NOREP indicating that "[a]lthough we agree that [R.F.] is eligible for special education services, we do not believe that the IEP meets all of [his] needs and is therefore inappropriate." S-32 at 5. In January 2017, R.F.'s father corresponded with the District and gave notice of the parents' intent to enroll R.F. at the Hillside Academy, a private school, for the duration of the 2016-2017 school year. *Id.* at 1. As a result, the District never implemented the December 2016 IEP. Hearing at 267.[30]

On February 7, 2017, the District invited the parents to a February 10, 2017 IEP team meeting. S-33 at 28. After the meeting on February 10, 2017, the District updated R.F.'s December 2016 IEP "to reflect team meeting based on parent's [sic] concerns." S-33 at 1. The District did not change any of R.F.'s goals but added two additional SDIs and/or modifications: (1) include R.F. in the guidance counselor's lunch group per the parents' request and (2) provide R.F. "supplemental instruction in reading (2 days per cycle) and written expression (3 days per cycle)" in the "RTII small-group classroom[.]" S-33 at 22.[31] The District also included a summary of the

---

[29] The District did not assign an actual teacher.

[30] R.F.'s grades at the time of his withdrawal from the District were: English Language Arts 5 (M1: C+, M2: B-), Math (M1: B+, M2: B), Science 5 (M1: B-, M2: C), Social Studies 5 (M1: A-, M2: A). S-35 at 1.

[31] The RtII intervention qualified as SDI because the District modified his "regular education" intervention to include two blocks and a writing portion. Hearing at 267, 597.

February IEP meeting, which included an explanation as to why the District deemed Dr. Schmidt's recommendations inappropriate. S-33 at 6. On February 23, 2017, the parents rejected the District's December 2016/February 2017 IEP. S-34 at 2; Decision at ¶ 92.[32]

### 6.    The Hearing Officer's Decision

The Hearing Officer found that with respect to each of the challenged IEPs, the plaintiffs failed to carry their burden. Decision at 2. As to the third-grade year, the Hearing Officer found that the December 2014 IEP included "measurable ambitious goals, related services and specially-designed instruction" based on a comprehensive evaluation that analyzed R.F.'s "cognitive ability, academic achievement, speech and language skills, auditory processing and motor skills." *Id.* at 21. The Hearing Officer also found that the December 2014 IEP properly educated R.F. in the "least restrictive setting." *Id.*

As to R.F.'s fourth-grade year, the Hearing Officer upheld the District's December 2015 and March 2016 REs. *Id.* at 21–23. Concerning the December 2015 RE, the Hearing Officer found the District violated the IDEA by conducting the RE without parental notice/consent; however, he found the error harmless because the District corrected itself and immediately issued the January 2016 PTE once the parents indicated their disagreement with the December 2015 RE's results.[33] *Id.* at 22. The Hearing Officer found that the District's March 2016 RE "included a careful review of the existing achievement assessment data, ability measures, speech assessments, reading assessments, OT/PT assessments, past vision assessments, past auditory processing assessments and included a review of the Student's participation in the District-wide and statewide assessments." *Id.* at 22. The Hearing Officer also found that based on R.F.'s "then known unique

[32] Although the record does not include S-34, the court requested it, and the parties provided it, because the Hearing Officer referenced said exhibit in his Decision.
[33] As described above, R.F. does not challenge the Hearing Officer's decision on this ground.

circumstances, present levels, strengths and weakness[es]" he agreed with the District's decision to exit R.F. from services and, as a result, found the IEP provided R.F. with a FAPE. *Id.* at 23.

The Hearing Officer also upheld the District's actions during R.F.'s fifth-grade year. *Id.* at 24. The Hearing Officer determined that the parents failed to meet their burden of proof and that "the evidence is in 'equipoise.'" *Id.* at 25. The Hearing Officer found that Dr. Schmidt, while credible, failed to provide him with the "quantum, quantity or weighty evidence that is greater than the quantity or weight of evidence produced by the District." *Id.* The Hearing Officer could not find, on the basis of the parents' IEE, that the December 2016 and February 2017 IEPs did not provide a FAPE to R.F. *Id.*[34]

The Hearing Officer also found persuasive the District's "cogent and responsive explanation that shows that, in light of [R.F.]'s unique circumstances, the IEPs as offered are reasonably calculated to enable [him] to make appropriate progress." *Id.* He further found that

> [t]he District staff forcefully explained how the IEPs and the RtII tier 2 interventions, in combination, met the *Endrew* [*F. ex rel. Joseph F. v. Douglas County School District RE-1*, 137 S. Ct. 988 (2017)] and [*Board of Education of Hendrick Hudson Central School Dist., Westchester County v.*] *Rowley*, [458 U.S. 176 (1982)], ambitious individualized substantive and procedural FAPE standard.

*Id.* As such, the Hearing Officer upheld the December 2016 and February 2017 IEPs. *Id.* Because he upheld the IEPs, the Hearing Officer did not discuss whether the District owed the parents

---

[34] Specifically, the Hearing Officer found that Dr. Schmidt

> failed to compare, contrast or reconcile the WIAT-III data with the IEE findings. Instead, the IEE evaluator noted that the somewhat outdated October 2015 WJ-III Reading Mastery testing supported the IEE findings. Although the private evaluator reviewed the Student's records, the evaluator did not discuss or reconcile the DIBELS [Dynamic Indicators of Basic Early Literacy Skills] data or the RtII tier 2 instruction and intervention data. When pressed on cross-examination, the IEE evaluator did not state the proposed IEP or the SDIs were inappropriate, inadequate or insufficient. Absent a clear reconciliation of the discrepant data, opinions and conclusions in the multiple reevaluation reports, this hearing officer cannot make a clear factual preponderant finding contrary to the District's conclusion about the Student's IDEA eligibility or the appropriateness of the IEP[s].

*Id.*

compensatory education. *Id.* at 26. The Hearing Officer also did not directly discuss whether the District owed the plaintiffs' reimbursement for their privately funded IEE. Instead, he merely found that the plaintiffs withdrew their request for a publicly funded IEE. *Id.* at 23.

### C. <u>Analysis</u>

In the motion for judgment on the administrative record, the plaintiffs argue that the Hearing Officer erred in concluding that the District provided a FAPE to R.F. because (1) the Hearing Officer applied the wrong legal standard (*i.e.*, focused on whether R.F. advanced from grade to grade and not whether the IEPs were appropriately ambitious); and (2) misunderstood the testimony of Dr. Schmidt and thereby improperly determined that the evidence in the matter was "equipoise." Pl.'s Mem. at 11. The plaintiffs also claim that they are entitled to both a publicly funded IEE and compensatory education because of the District's failure to provide a FAPE to R.F. In its opposition to the motion, the District contends that the Hearing Officer applied the correct legal standard, understood Dr. Schmidt's testimony, and properly found that they provided a FAPE to R.F. Def.'s Resp. Br. in Opp. to Pl.'s Mot. for Disposition on the Admin. R. ("Def.'s Resp.") at 2–8, Doc. No. 10. The court first addresses whether the Hearing Officer correctly determined that the District provided a FAPE to R.F. under the correct legal standard and then analyzes whether the District owes compensation to the parents for their IEE or private school tuition.

### 1. The Hearing Officer Correctly Found that the District Provided R.F. a FAPE

The IDEA mandates that schools provide disabled students with a FAPE. *Rowley*, 458 U.S. at 181. A school provides a FAPE when it provides "special education and related services that[:]"

> (**A**) have been provided at public expense, under public supervision and direction, and without charge;

**(B)** meet the standards of the State educational agency;
**(C)** include an appropriate preschool, elementary school, or secondary school education in the State involved; and
**(D)** are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

"The 'free appropriate public education' required by the Act is tailored to the unique needs of the handicapped child by means of an 'individualized educational program' (["]IEP["])." *Rowley*, 458 U.S. at 181 (citation omitted). An IEP must be "reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.[35] To satisfy this standard, an IEP "must be appropriately ambitious in light of [the child's] circumstances . . . ." *Id.* at 1000. "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. § 1414(d)(1)).

"For a child fully integrated in the regular classroom, an IEP typically should be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Id.* at 999 (quoting *Rowley*, 458 U.S. at 203–04). However, if the child is not fully integrated, an IEP may still be appropriately ambitious, even if it does not allow the student to "advance at a grade-level pace." *K.D.*, 904 F.3d at 255, 256. As such, even slow or intermittent progress does not necessarily mean the IEP failed to challenge the student. *Id.* (rejecting argument

---

[35] The Supreme Court in *Endrew F.* did not overrule the Third Circuit Court of Appeals' "meaningful benefit" test. *See K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) ("*Endrew F.* did not overrule Third Circuit precedent."). The Third Circuit's test requires that "the educational program 'must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *Id.* (quoting *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012)).

that student's "slow progress[,]" in light of her disabilities, indicated that her "IEPs were not challenging enough or updated enough[]").

In the present case, the Hearing Officer correctly applied the relevant legal standard to each IEP.[36] The plaintiffs argue, without identifying specific errors as to each challenged IEP, that the Hearing Officer erred by focusing on R.F.'s grades and ability to advance from grade-to-grade while "ignoring the myriad of evidence in the record that indicated that [R.F.] was nevertheless struggling in multiple educational areas due to the District's inadequate and inappropriate IEPs." Pl.'s Mem. at 26. These arguments are unavailing because, contrary to the plaintiffs' argument, the Hearing Officer identified the correct legal standard by noting that "an educational program must be appropriately ambitious in light of [the child's] circumstances… [sic] [and] every child should have the chance to meet challenging objectives." Decision at 18 (alterations in original) (quoting *Endrew F.*, 137 S.Ct. at 1000). In addition, with respect to each challenged IEP, the Hearing Officer conducted a comprehensive review of the record and correctly considered not only R.F.'s grades and ability to advance each year—factors the Supreme Court deems "important" in judging an IEP—but also reviewed his consistently average evaluation results. *See Rowley*, 458 U.S. at 203 ("The grading and advancement system thus constitutes an important factor in determining educational benefit."); *see also Jack J.,* 2018 WL 3397552, at *13 (holding that

---

[36] To the extent the plaintiffs contend that the IEPs failed to provide a FAPE to R.F. because the IEPs lacked specific goals and SDI for executive functioning, the court finds this argument without merit. It is not error for a school district to address a student's "executive functioning skills in other, more specific categories of the IEP." *Benjamin A. through Michael v. Unionville-Chadds Ford Sch. Dist.*, Civ. A. No. 16-2545, 2017 WL 3482089, at *11, 13 (E.D. Pa. Aug. 14, 2017) (citations omitted). Here, all of R.F.'s IEPs included measures aimed at assisting him in developing executive functioning skills. *See* P-11 at 17–18 (including goals for organizational skills in third grade IEP); S-29 at 19 (including modifications to allow R.F. to focus better on assignments in fifth grade IEP); *see also Benjamin A.*, 2017 WL 3482089, at *11 (finding that IEPs which included goals within "writing and reading comprehension" goal related to thought organization and assignment execution as addressing student's executive functioning and that overall school did not err in declining to include specific goal for executive functioning). R.F.'s 504 Plans also included modifications aimed at assisting his development of executive functioning skills. *See, e.g.*, P-25 (allowing in April 2016 504 Plan R.F., *inter alia*, to take tests in quiet areas and be "seat[ed] away from noises and distractions").

hearing officer permissibly reviewed grades and student's academic achievements); *E.D. by &
through T.D. v. Colonial Sch. Dist.*, Civ. A. No. 09-4837, 2017 WL 1207919, at *11 (E.D. Pa.
Mar. 31, 2017) ("To ascertain whether a disabled child received a meaningful educational benefit,
we look to regular examinations, grades, and advancing from grade to grade as important factors
in measuring the educational benefit received by the disabled student." (citation omitted)).[37]

With respect to the third-grade IEP, the Hearing Officer found it sufficiently ambitious for
R.F. based on his demonstrated abilities at the time the District developed the IEP. At that time,
the District knew that R.F: (1) consistently tested in the average range, (2) obtained passing grades
in the second grade, and (3) revealed the ability to succeed in the regular education curriculum
both socially and academically. Decision at 21. The Hearing Officer also reviewed R.F.'s progress
with his IEP goals and found that the IEP allowed him to improve such that the IEP offered him a
"meaningful benefit in advancing [his] speech and language present levels and skills." *Id.* Contrary
to the plaintiff's arguments (and as indicated *supra*), "[t]he Third Circuit has explicitly held that
*Endrew F.* did not overrule the meaningful–benefit test[,]" *E.P. v. N. Arlington Bd. of Educ.*, Civ.
A. No. 17-8195, 2019 WL 1495692, at *4 (D.N.J. Apr. 1, 2019), and the Hearing Officer did not
err simply by considering R.F.'s ability to advance or obtain passing grades during his review of
all the record evidence.[38] *See Parker C. through Todd v. W. Chester Area Sch. Dist.*, Civ. A. No.

[37] The plaintiffs spend the majority of their brief arguing that the District failed to properly evaluate R.F. to identify
the full range of his disabilities. *See* Pl.'s Mem. at 22 ("Yet, the Hearing Officer incorrectly ignored these substantial
deficiencies in the District's evaluations merely because [R.F.] obtained passing grades."). To the extent the plaintiffs
attempt to argue that the Hearing Officer erred because he should have found that the District failed to
comprehensively test R.F. in response to their request for an IEE, this issue was not properly raised. *See infra* Part 3.a.
Further, the court finds the Hearing Officer properly considered all the record evidence in his thorough opinion. *See
Timothy F.*, 2014 WL 1301955, at *6 ("As for attention and behavior issues and Parents' insistence that their own
opinions of Student's problems were 'ignored,' it is important to recognize that there is a difference between, on the
one hand, ignoring data, and on the other hand, considering data but finding it unpersuasive or outweighed by other
evidence." (footnote omitted)).

[38] The record further supports the Hearing Officer's decision because the District offered R.F. a customized IEP based
in his areas of need. Given R.F.'s overall average performance on the evaluations prepared and/or provided to the
District at the time it developed the third-grade IEP, it appropriately tailored the IEP to his needs. *See* Decision at ¶
10 ("Consistent with previous assessments from the other school district, the District's assessments showed no

16-4836, 2017 WL 2888573, at *10 (E.D. Pa. July 6, 2017) ("Courts may rely on district progress reports and evaluations." (citation omitted)). Therefore, the court finds that the Hearing Officer neither committed any clear errors in his factual findings nor any errors in his application of the law with respect to the third-grade IEP.

Regarding the fourth-grade evaluations, the Hearing Officer also correctly applied the relevant legal standard.[39] Notably, the District found that R.F. should be exited from services during the December 2015 and March 2016 Reevaluations.[40] As the Hearing Officer correctly determined, the District's March 2016 Reevaluation revealed that R.F. could be exited from services based on his ability to meet his IEP's goals. Decision at 23.[41] Given the IDEA's

---

[39] It is unclear exactly which IDEA provisions the plaintiffs argue the Hearing Officer violated by upholding the March 2016 RR; however, the court presumes the plaintiffs argue that the March 2016 IEE failed to comprehensively evaluate R.F. (for purposes of their IEE reimbursement claim) and improperly "exited" R.F. from services. As such, the court addresses each argument in this section and describes why each fails as a matter of law. *See Timothy F.*, 2014 WL 1301955, at *6 ("Further, in most cases, the Courts are called on to determine whether an Individualized Education Plan (IEP) is appropriate or sufficient, rather than whether one should have been offered when it was not, so there is relatively little guidance for assessing the latter type of determination.").

significant ongoing academic achievement concerns (S-10 pp.3-4, S-6 pp.8-9).") Therefore, the District did not err simply because they reduced the number of goals from eight to two. *See Ridley Sch. Dist.*, 680 F.3d at 269 ("Although the IEP must provide the student with a 'basic floor of opportunity,' it does not have to provide 'the optimal level of services,' or incorporate every program requested by the child's parents." (citations omitted)).

[40] Given that the District concluded that R.F. still qualified as a student with an APD disability, *see* S-19 at 5 (finding R.F. has APD but "does not require specially designed instruction at this time"), it does not appear that the plaintiffs argue that the District erred in declassifying him (*i.e.*, determining that he did not qualify as a student with a disability). However, to the extent the plaintiffs do make such an argument, it appears that the District bears the burden as to whether it properly declassified a student under the IDEA. *See E.P.*, 2019 WL 1495692, at *9 (D.N.J. Apr. 1, 2019) ("[T]he school district bears the burden of demonstrating that it complied with the IDEA in deeming the child ineligible for special education services." (citations and quotation marks omitted)). Regardless of which party bears the burden of proof with respect to this issue, the court, as described above, agrees with the Hearing Officer and finds said reevaluations, and the District's decision to exit R.F. from SDI, appropriate under the IDEA.

[41] The District's ultimate goal for R.F., as indicated in his third-grade IEP, was his ability "to progress within the regular education classroom with same-aged peers." S-11 at 10. As such, when he ultimately did make timely, grade-level progress, and their evaluations indicated that he no longer required SDI, the Hearing Officer did not err in upholding the District's decision to exit R.F. from services based on what the District knew at the time. Further, while the District did not consider Dr. Flounder's report persuasive given the discrepancy between her results and R.F.'s abilities in the classroom and their own testing results, the District conducted their own evaluations and reasonably concluded that R.F. no longer qualified for SDI. *See* S-23 at 16 (describing the results of Dr. Flounder's October 2016 Woodcock Reading Mastery Test-III); *id.* at 38 (noting that its own data on R.F. was "very inconsistent with the scores received in the private evaluation completed by Kim Flounders" and, as such, determining that R.F. "[did] not have significant reading needs at [the] time[]"). As such, the court agrees with the Hearing Officer's well-reasoned decision to uphold the March 2016 RR even though it conflicted with Dr. Flounder's results and all of her recommendations were not implemented. Decision at 22–23.

mainstreaming mandate[42] and R.F.'s ability to successfully master his third-grade IEP goals, the District reasonably concluded that R.F. could "graduate" from special education into the regular education curriculum with specialized reading interventions and a 504 Plan.[43] *Cf. E.P.*, 2019 WL 1495692, at *10 (finding that school district did not err in declassifying, *i.e.*, "exiting," student from special education when she met majority of her IEP goals pursuant to New Jersey's IDEA implementing regulations); *Timothy F.*, 2014 WL 1301955, at *6–7 (finding school did not violate IDEA when it determined disabled student best educated in regular education classroom given his generally average testing scores and demonstrated ability to succeed in regular classroom environment with 504 plan);[44] *see also J.P.E.H. v. Hooksett Sch. Dist.*, Civ. No. 07-cv-276-SM,

---

[42] *See E.P.*, 2019 WL 1495692, at *9 ("To determine whether a school district complies with the [least restrictive environment] requirement, the Third Circuit has adopted a two–part test. First, a court must determine whether the school can educate the child in a regular classroom with the use of supplementary aids and services. In making this determination, courts consider: (1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom. If the child cannot be educated in an integrated classroom, the court must "decide whether the school is mainstreaming the child to the maximum extent possible." (internal citations and quotation marks omitted)).

[43] In order to "exit" a student from special education,

> [a] school district must not decide that the child is ineligible for special education services without conducting a reevaluation. *E.g.*, 20 U.S.C. § 1414(c)(5). IDEA expressly provides that "a local educational agency *shall* evaluate a child with a disability in accordance with this section before determining that the child is no longer a child with a disability." *Id.* § 1414(c)(5) (emphasis added); *see also* 34 C.F.R. § 300.305(e)(1) ("[A] public agency must evaluate a child with a disability in accordance with §§ 300.304 through 300.311 before determining that the child is no longer a child with a disability.").

*Wimbish v. D.C.*, 381 F. Supp. 3d 22, 27 (D.D.C. 2019).

[44] To the extent the plaintiffs seek to argue that the District violated the "child find" requirement by failing to test R.F. in all his potential areas of need, the court finds this argument without merit. "The Child Find obligation requires schools to identify children with disabilities, and because of the way that term is defined, that means a proper determination of IDEA eligibility rests on a finding not only that a child has a disability, but also that he or she, 'by reason thereof, needs special education and related services.'" *Timothy F.*, 2014 WL 1301955, at *6 (quoting 20 U.S.C. § 1401 and 34 C.F.R. § 300.8). "[T]he correctness of eligibility determinations is generally subsumed into the overall question of whether a district violated its Child Find obligation." *Id.*

When conducting said analysis, courts "have simply noted the results of appropriately conducted evaluations, considered whether the determination took into account all the appropriate data, and engaged in their own assessment of the conclusion that a child was ineligible based on the data from the evaluation and the general logic and reasonableness of the district's and hearing officer's findings." *Id.* (citations omitted). Here, the parties agree that the evaluations were conducted appropriately. Decision at 21 ("The Parties do not dispute the fact that the assessments/evaluations were administered consistent with the test makers' instructions."). The evaluations as described above in section B.3, thoroughly considered all areas of R.F.'s needs based on the data available to the

2009 WL 1883885, at *5 (D.N.H. June 30, 2009) (finding school did not deny student FAPE when unrebutted evidence indicated student adequately performed in regular education classroom without SDI).[45] Therefore, the Hearing Officer did not err in finding both the District's revaluations and its decision to exit R.F. from special education proper.[46]

Concerning the fifth-grade IEPs (December 2016 and February 2017),[47] the court also finds that the Hearing Officer did not err in finding the District provided a FAPE to R.F. In this regard, the Hearing Officer specifically found that the SDIs in written expression combined with the regular education reading interventions via the RtII program provided R.F. with a FAPE. Decision at 26. The Hearing Officer properly considered R.F.'s ability to progress through the regular education RtII programming as support for the District's decision that he did not require special education in the area of reading. *Id.* at 24.[48] The Hearing Officer further found that "the IEPs

District. Here, with respect to the District's the initial evaluation of R.F. conducted in 2014 when he first arrived at the District, the court finds that said evaluation complied with the "child find" requirements under the IDEA and comprehensively evaluated R.F. in his identified areas of need based on the data available to the District at the time. S-10. To the extent the plaintiffs argue the District violated the "child find" provisions with respect to any subsequent evaluations, the court also agrees with the Hearing Officer that said evaluations were appropriately comprehensive to identify R.F.'s potential disabilities.

[45] As with the Third Circuit, the First Circuit also found that *Endrew F.* did not abrogate its IDEA precedent. *See Johnson v. Bos. Pub. Sch.*, 906 F.3d 182, 194 (1st Cir. 2018) ("In our view, the standard applied in this circuit comports with that dictated by *Endrew F.*").

[46] It appears that the Hearing Officer considered the continuation of R.F.'s third-grade IEP into his fourth-grade year as his fourth-grade IEP. Decision at 23.

[47] The plaintiffs assert that the court cannot consider the February 2017 IEP because the District developed it "after the 10-day notice period that the Parents were required to give pursuant to 34 C.F.R. §300.148(d)(1)(ii), and after [R.F.] already withdrew from the District and was attending Hillside." Pl.'s Mem. at 33 (citing *Norristown Area Sch. Dist. v. Frank*, Civ. A. No. 13-5612, 2014 WL 11370484, at *11 n.9 (E.D. Pa. June 18, 2014), *aff'd sub nom. Norristown Area Sch. Dist. v. F.C.*, 636 F. App'x 857 (3d Cir. 2016)). The court finds *Norristown Area School District v. F.C.* inapposite because there the district court did not actually consider whether the hearing officer erred in failing to consider the IEP developed after the student left the school. *Id.* Instead, the court deemed it "an issue we need not resolve" because the IDEA's provisions about when a school district can move a child during a school year did not require the hearing officer to consider the after-developed IEP in his compensatory education analysis. *Id.* Additionally, the ten-day notice requirement 34 C.F.R. § 300.148(d)(1)(ii) does not relate to when a hearing officer can consider an IEP.

[48] The plaintiffs contend in their reply brief that the District violated the IDEA by using the RtII intervention at school. Pl.'s Reply Br. in Resp. to Def. Southern Lehigh Sch. Dist.'s Resp. in Opp. to Pls.' Mot. for J. on the R. at 6, Doc. No. 11. The plaintiffs also argue that the District violated the IDEA because R.F. required SDI, not RtII, in the area of reading. *See* Pl.'s Mem. at 29 (arguing that District erred, in part, by failing to include a reading goal in R.F.'s December 2016 IEP). However, the caselaw cited by the plaintiffs does not support either argument. As to their dispute regarding RtII usage in general, their argument fails because RtII is not special education and the District did not rely

included appropriately ambitious goals and SDIs that would enable [R.F.] to participate and advance through the general education curriculum." *Id.* at 26.

The court sees no error in the Hearing Officer's decision because the District appropriately crafted the fifth-grade IEPs based on the plaintiffs' IEE and complied with the IDEA's mainstreaming requirement. The fifth-grade IEPs specifically incorporate SDIs in written expression, the area wherein the District's subsequent testing, performed after receiving the privately funded IEE, revealed weaknesses. S-29 at 13 (indicating R.F. scored in "below average" or "poor" range for majority of subtests administered on TOWL-4); S-33 at 20. As described further below, *see infra* C.2, the Hearing Officer properly discredited Dr. Schmidt's testimony given her inability to "reconcile" her findings with the District's testing data. Decision at 25. As such, the Hearing Officer did not err in upholding the District's decision not to include SDI in all the areas recommended by Dr. Schmidt. The District also attempted to educate R.F. in the least restrictive environment pursuant to the IDEA's mainstreaming mandate and R.F. appeared to successfully navigate the regular education curriculum with his 504 Plan modifications. *See, e.g.*, S-29 at 12 (showing R.F. as obtaining passing grades). Here, the District did not impermissibly rely on the IDEA mainstreaming requirement to place R.F. in a situation where all signs indicated he would not succeed. *Cf. S.K. ex rel. N.K. v. Parsippany-Troy Hills Bd. Of Educ.*, Civ. A. No. 07-4631(SRC), 2008 WL 4561512, at *10 (D.N.J. Oct. 9, 2008) (finding that school failed to provide student with FAPE when it attempted to continue to place her into regular education classroom

---

on RtII as a mechanism to avoid providing R.F. *necessary* SDI or to *identify* him as a student with a disability. *See Sch. District of Phila. v. Post*, 262 F. Supp. 3d 178, 193–97 (E.D. Pa. 2017) (finding that school violated IDEA by placing student in RtII interventions, removing student from regular education curriculum, and placing her into special education because this violated IDEA's "stay put" provisions, parental notice procedural rights, and mainstreaming requirements). Instead, the District used the RtII programming as a complement to the SDI provided to R.F. through his December 2016 and February 2017 IEPs and to aid R.F. in an area of weakness (reading) where his abilities fell slightly below average, but higher than the requisite standard to obtain SDI. *Id.* at 25. As such, the court agrees with, and defers to, the Hearing Officer's finding that the District persuasively explained how said tools together provided R.F. a FAPE. Decision at 25.

even though IEP previously "yielded extremely poor results"). This distinction separates R.F.'s IEP from those in which schools merely seek to pass a disabled student from grade-to-grade regardless of his or her ability to obtain any meaningful educational benefit from the regular education curriculum. *See Rowley*, 458 U.S. at 179 (describing IDEA as passed because of "Congress' perception that a majority of handicapped children in the United States were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out." (alteration in original) (citation and quotation marks omitted)). Instead, the District reasonably concluded that, even though R.F. exhibited some weaknesses in the area of reading, regular education interventions and a 504 Plan allowed him to succeed. *Cf. Timothy F.*, 2014 WL 1301955, at *7 (finding no error when school determined disabled student "did not require specially designed instruction" because "[t]he question of what type of instruction will best suit Student's needs is the sort most clearly within the expertise of the District as compared with the Court[]"). Thus, the court agrees with the well-reasoned opinion of the Hearing Officer and finds that the fifth-grade IEPs provided R.F. with a FAPE.

## 2. The Hearing Officer Properly Determined the Evidence to be "Equipoise"

The plaintiffs claim that the Hearing Officer misunderstood Dr. Schmidt's testimony and, as a result, improperly determined the evidence to be "equipoise." Pl.'s Mem. at 27. In response, the District argues that the plaintiffs failed to meet their burden based on weaknesses in Dr. Schmidt's testimony. Def.'s Resp. at 8.[49]

"[V]ery few cases will be in evidentiary equipoise." *Schaffer ex rel. Schaffer*, 546 U.S. at 58. If the Hearing Officer determines evidence is "equipoise[,]" then the party challenging the IEP, *i.e.*, the party with the burden of persuasion, failed to carry their burden and loses. *See id.* at 62

---

[49] During oral argument, counsel for the District further addressed this argument and noted that the Hearing Officer correctly construed the testimony of Dr. Schmidt after considering both her direct *and* cross examination testimony.

("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."); *Ridley Sch. Dist.*, 680 F.3d at 271 ("As the Supreme Court has explained, in a non-criminal case, the burden of persuasion only comes into play where the evidence is "closely balanced," i.e., in cases "in evidentiary equipoise[.]" (citations omitted)).

Contrary to the plaintiffs' contention, the Hearing Officer did not err in finding Dr. Schmidt's testimony of minimal persuasive value based on weaknesses in her testimony.[50] A review of Dr. Schmidt's testimony reveals her general lack of knowledge regarding the District's regular education programs and an inability to specifically state, when under the pressure of cross-examination, that the IEPs failed to provide R.F. with a FAPE. Decision at 25 (describing impact of Dr. Schmidt's failure to reconcile conflicting testing data and stating that "[a]bsent a clear reconciliation of the discrepant data, opinions and conclusions in the multiple reevaluation reports, this hearing officer cannot make a clear factual preponderant finding contrary to the District's conclusion about [R.F.]'s IDEA eligibility or the appropriateness of the IEP[s]"). Instead, Dr. Schmidt affirmatively stated she did not believe the District offered IEPs that failed to offer R.F. with a FAPE, but rather, that she would have administered additional tests.[51] Therefore, the court

---

[50] The Hearing Officer found all parties to be credible; however, he appeared to discount the value of Dr. Schmidt's testimony based on her inability to grapple with record evidence that conflicted with her assessment of R.F.'s abilities. *See* Decision at 17 ("This hearing officer found each of the witnesses to be generally credible with respect to the factual matters important to deciding the issues, testifying to the best of his or her recollection; discrepancies may be attributable to a lack of precise memory and differing perspectives.").

[51] The relevant testimony on cross-examination is as follows:

> A. Well, my conclusion today is that they are wrong based on my evaluation of [R.F.] and the reading needs that I identified. I am --
> Q. At the point in time March 2016 based on these test scores, you wouldn't have recommended specially designed instruction for reading based on that information?
> A. That's correct.

Hearing at 418.

The District also clarified whether Dr. Schmidt considered the District to err in determining that R.F. did not qualify for SDI in writing:

finds under the deferential standard of review afforded to the Hearing Officer's factual findings, that the Hearing Officer did not err in regarding Dr. Schmidt's testimony as insufficient to carry the plaintiffs' burden.

**3.      The Plaintiffs are Not Entitled to Compensation for the IEE or Private Schooling**

The parents argue that the Hearing Officer erred in concluding that they are not entitled to reimbursement for the August 2016 IEE or compensatory education. Pl.'s Mem. at 2. In response, the District appears to rest on its argument that they provided R.F. with a FAPE.

a.      IEE Reimbursement

The plaintiffs seek reimbursement for the 2016 IEE prepared by Dr. Schmidt. Pl.'s Mem. at 37. The plaintiffs contend that the Hearing Officer erred in finding that the March 2016 RR was appropriate and should have awarded the parents' reimbursement. *Id.* at 38. In response, the District does not directly address the plaintiffs' arguments, but instead states that "[t]he Hearing Officer correctly reviewed each evaluation to determine whether it met the IDEA criteria for an appropriate evaluation." Def.'s Resp. at 14.[52]

"A parent has the right to an IEE at public expense if the parent disagrees with the evaluation obtained by the school." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 740 (3d Cir. 2009) (citing 34 C.F.R. § 300.502(b)(1)). Here, the plaintiffs admit that R.F.'s parents requested a publicly funded IEE but ultimately withdrew their request. *See* Pl.'s Mem. at 8 n.5 ("Initially, the Parents requested that the School District fund the IEE, which was denied. As

_____

Q. When you said you have concerns about the District's conclusion that he no longer needed specially designed instruction, you are saying it was concerning enough that you felt you needed to do new testing, not that the District was necessarily wrong?

A. Correct. Yes, that's correct. At the time in 2016, it was not clear to me, you know, that the Flounder scores are very low.

Hearing at 418–19.
[52] The District did not address whether the plaintiffs are entitled to IEE reimbursement.

a result, the matter initially proceeded to a hearing, but prior to the hearing commencing, the Parents withdrew the request for the IEE at that time to first pursue testing on their own without delay."). However, the plaintiffs cannot recover for an IEE sought outside the proper channels, *i.e.*, without allowing the District to challenge the decision in a due process hearing. *Cf. Benjamin A.*, 2017 WL 3482089, at *18 ("The Court further finds that Parents are not entitled to reimbursement for the IEE because they sought Dr. Schmidt's evaluation outside the collaborative process, and only sought reimbursement after unilaterally contacting Dr. Schmidt.").

As stated above, the plaintiffs admit that the parents withdrew their request for a publicly funded IEE so they could obtain Dr. Schmidt's IEE faster than the due process proceeding allowed. Pl.'s Mem. at 8 n.5. This unique scenario differs from when a student's parents merely fail to indicate their disagreement with the school district's evaluation prior to obtaining an IEE—an action that does not necessarily preclude reimbursement—and more closely aligns with one wherein the parent unilaterally obtains an IEE. *Cf. Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 275 (3d Cir. 2007) (noting that IEE reimbursement "may be warranted where a parent does not take a position with respect to the district's evaluation or otherwise fails to express disagreement" (internal quotation marks omitted)); *L.M., ex rel. M.M. v. Downingtown Area Sch. Dist.*, Civ. A. No. 12-CV-5547, 2015 WL 1725091, at *25 (E.D. Pa. Apr. 15, 2015) ("Here, we conclude plaintiffs are not entitled to reimbursement, because plaintiffs unilaterally sought an independent evaluation outside the collaborative IEP process and only sought reimbursement after unilaterally contacting an independent evaluator."). Therefore, the court denies the plaintiffs' request for IEE reimbursement because the parents withdrew their request and may not then re-raise this argument in this proceeding several years later.[53]

---

[53] The Hearing Officer also found that the plaintiffs withdrew the request for a publicly funded IEE. Decision at 23 ("When the Parents returned the NOREP, they requested a publically [sic] funded IEE, which request they later

### b.     Compensatory Education

Under section 1415 of the IDEA,

> a "district court is authorized to grant 'such relief as the court determines is appropriate,' including attorneys' fees, reimbursement for a private educational placement, and compensatory education." *A.W.*[ *v. Jersey City Pub. Sch.*, 486 F.3d 791, 802 (3d Cir. 2007) (en banc)] (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)). Compensatory education "aim[s] to place disabled children in the same position they would have occupied but for the school district's violations of IDEA," by providing the educational services children should have received in the first instance. *Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005). This "judicially-created remedy ... has received the imprimatur of this Court," *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 496 (3d Cir. 2012), and reflects the "broad discretion," *Bucks Cnty. Dep't of Mental Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61, 67 (3d Cir. 2004), that Congress has granted to the courts "to remedy the deprivation of the right to a free appropriate education," *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 536 (3d Cir. 1995).

*G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608 (3d Cir. 2015); *see also E.P.*, 2019 WL 1495692, at *1 ("Parents who disagree with their child's placement may enroll their child elsewhere and seek reimbursement, but reimbursement is not required if the school district offered the student a FAPE." (citation omitted)).

Here, as described above, the court finds no error in the Hearing Officer's decision; therefore, R.F. was not denied a FAPE and the court "need not consider whether [plaintiffs] are entitled to tuition reimbursement[.]" *Coleman v. Pottstown Sch. Dist.*, 581 F. App'x 141, 149 (3d Cir. 2014); *see, e.g.*, *E.P.*, 2019 WL 1495692, at *11 (finding that school district properly deemed student ineligible for special education and thereby student was ineligible for compensatory education).

---

withdrew when they decided to obtain a privately funded IEE."). However, the Hearing Officer did find the March 2016 RR appropriate and did not conduct an IEE-reimbursement analysis. *Id.* at 22. While the court finds this argument waived, it also agrees with the Hearing Officer that the March 2016 RR was appropriately comprehensive.

### III.     CONCLUSION

After reviewing the record, the Hearing Officer's decision, and the parties' briefing, the court concludes that the Hearing Officer did not err in finding that the District provided R.F. with a FAPE during the challenged years. The Hearing Officer applied the correct legal standard, properly considered the factual record, and ultimately reached the correct conclusion—that the District provided R.F. with a FAPE during his third, fourth, and fifth grade years. Therefore, court denies the plaintiffs' motion for judgment on the administrative record.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.